IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF
OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| BETH ANN ST. CLAIRE, | ) | CASE NO. 3:20CV1399 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **MEMORANDUM OPINION & ORDER** |
| Defendant. | ) | |

Plaintiff Beth Ann St. Claire ("St. Claire") seeks judicial review of the final decision of

Defendant Commissioner of Social Security ("Commissioner") denying her application for

disability insurance benefits ("DIB").  Doc. 1.  This Court has jurisdiction pursuant to 42 U.S.C.

§ 405(g).  This case is before the undersigned Magistrate Judge pursuant to the consent of the

parties.  Doc. 10.

For the reasons stated below, the undersigned recommends that the Commissioner's

decision be **AFFIRMED**.

## I. Procedural History

St. Claire protectively filed an application for DIB on October 16, 2014, alleging a

disability onset date of February 25, 2014.  Tr. 99, 248.  She alleged disability based on the

following: weakness in hands, migraines, problems with left knee, arthritis in whole body, bone

spur in neck, lower back pain, depression, fibromyalgia, PTSD, and anxiety.  Tr. 299.  After

denials by the state agency initially and on reconsideration, a hearing was held before an

Administrative Law Judge ("ALJ") on March 8, 2017.  Tr. 46.  The ALJ issued a partially

favorable decision on June 29, 2017, finding that St. Claire became disabled in December 2016,

when her age category changed to a person of advanced age, but that she was not disabled prior to that date.  Tr. 19-37.  St. Claire requested review of the unfavorable portion of the decision to the Appeals Council, and the Appeals Council denied review.  Tr. 1-4.  St. Claire filed a civil action in the Northern District of Ohio, and the parties stipulated to a remand in August 2018. Tr. 1204.

Based on the stipulated remand, the Appeals Council vacated the unfavorable portion of the ALJ's decision and listed the issues to resolve on remand for the period prior to December 2016, including further consideration of the nature and severity of St. Claire's fibromyalgia and further evaluation of her alleged symptoms and residual functional capacity.  Tr. 1210-1211. The ALJ held a second hearing on May 15, 2019.  Tr. 1090-1113.  On July 10, 2019, the ALJ issued a decision, again finding that St. Claire was not disabled prior to December 2016.  Tr. 1059-1079.  St. Claire requested review of the ALJ's decision by the Appeals Council (Tr. 1302) and, on April 30, 2020, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1049.

## II. Evidence

### A.  Personal and Vocational Evidence

St. Claire was born in 1961 and was 52 years old on the alleged onset date.  Tr. 1077. She graduated from high school and attended some college.  Tr. 53.  She previously worked at Kroger as a deli worker and cashier.  Tr. 62.

### B.  Relevant Medical Evidence

During a visit with a certified nurse practitioner at a neurology clinic in 2013, St. Claire recounted a history of multiple surgeries: neck surgery in 2009 and 2012; lumbar surgery in 2010; and left knee surgery in 2007.  Tr. 479.

In April 2013, St. Claire visited pain management and reported headaches, cervical spine pain radiating into both arms, and low back pain radiating into both legs.  Tr. 497.  Upon exam, she had pain with rotation of her head past 60 degrees, positive bilateral cervical facet loading maneuvers, positive Hoffman's sign on the right, and some dullness to light touch and pinprick on her left lower extremity.  Tr. 497-498.  She was able to transition from sitting to standing without difficulty and walked with a non-antalgic gait.  She had full, equal motor strength in her upper and lower extremities, normal reflexes, and negative straight leg raise testing in a seated position.  The impression was cervical spondylosis and cervical spinal stenosis.  Continued conservative care was recommended for her lumbar symptoms and cervical facet joint injections were recommended.  She received cervical epidural steroid injections in May and June 2013, Tr. 516, 517-518, and a lumbar epidural spinal injection in September 2013.  Tr. 521.

In November 2013, St. Claire returned to pain management complaining of 5/10 pain in her shoulders, back, and legs.  Tr. 474.  Upon exam, she was able to transition from sitting to standing without difficulty and walked with a non-antalgic gait.  There were no observed neurological deficits in her legs and it was noted that she gave poor effort during motor strength testing.

On February 18, 2014, St. Claire visited pain management for pain in her head, shoulders, low back, and legs, rated 5/10.  Tr. 524.  Upon exam, she had palpatory tenderness at 15 out of 18 fibromyalgia points.

Later that month, St. Claire saw Dr. Gladden, M.D., for her left knee complaints.  She reported that she had injured her left knee at work in 2008.  Tr. 402.  Since then, she had developed posttraumatic arthritis and her symptoms had returned.  Tr. 402, 405.  Knee injections had not been helpful, so arthroscopic surgery was performed on February 26.  Tr. 402-404.

On June 24, 2014, St. Claire saw Dr. Gladden for a 4-month follow up after her knee surgery.  Tr. 684.  Dr. Gladden noted that she "has attended therapy and seems to be making some progress."  She was off work "because of other issues."  Upon exam, she had minimal effusion, improved range of motion, and she still had "obvious atrophy and weakness in the quadriceps and hamstring musculature."  Dr. Gladden prescribed Norco.

On June 30, 2014, St. Claire visited pain management for neck, shoulder, low back, and leg pain, rated 3/10.  Tr. 457.  Upon exam, she was able to transition from sitting to standing without difficulty and walked with a non-antalgic gait.  She had no observed neurological, musculoskeletal, or sensory deficits in her upper extremities or neck.

On September 14, 2014, St. Claire returned to pain management reporting that her cervical, shoulder, low back, and bilateral leg pain was 6/10.  Tr. 449.  As before, her pain was aggravated by twisting, pushing, pulling, standing, walking, housework, lifting, stairs, and bending, and alleviated by applying ice.  Her functioning, mood, and sleep were worse since her last visit in June.  Upon exam, she was able to transition from sitting to standing without difficulty and walked with a non-antalgic gait.  She had positive facet loading maneuvers, slightly reduced (4/5) shoulder abduction on the left and a positive Hoffman's reflex, weak hand grasp bilaterally (3/5), and hand tremors.  A cervical spine MRI was recommended.

On September 22, 2014, St. Claire saw Dr. Gladden for a follow up for her knee.  Tr. 680.  She reported significant improvement since her last visit.  She had been cleared to return to work with no restrictions on July 23, but she had not returned to work due to her psychological issues.  Upon exam, she had improvement with no new problems or positive findings.

On September 25, 2014, St. Claire saw Dr. Bundy, D.O., for counseling, reporting continued problems with anxiety, panic, depression, PTSD, poor focus, and having a hard time

getting out.  Tr. 431.  She was not able to return to work.  She was "still traveling," dating once a week, and spending time with her daughter and grandchildren on a regular basis.

In October, an MRI of St. Claire's cervical spine showed slight progression of the mild disc spur complex at C4-5 causing mild indentation of the anterior spinal subarachnoid space and minimal flattening of the anterior spinal cord.  Tr. 509.  An MRI of her lumbar spine showed increased degenerative changes with disc bulge and a 3 mm anterior subluxation L4 on L5, chronic degenerative and post-surgical changes at L5/S1, moderate central stenosis at L4, and neural foraminal stenosis at L4/L5 and L5/S1.  Tr. 507-508.

On November 3, 2014, St. Claire saw Dr. Hafeez, M.D., at the Neurology Headache and Fibromyalgia Clinic.  Tr. 417-419.  She reported pain in her neck, shoulder, hips, back, and extremities and having 12-15 headaches per month.  Upon exam, she had tenderness in multiple areas of her extremities and trunk bilaterally and decreased range of motion in her cervical and lumbar spine.  She had a steady gait with normal coordination, intact reflexes, and slightly decreased grip strength bilaterally (4+/5).  Dr. Hafeez diagnosed degenerative spine disease with post-surgical pain, chronic migraine headache/medication overuse headaches, fibromyalgia and chronic fatigue syndrome, anxiety and depression, and carpal tunnel syndrome.  He adjusted her medications.

On November 6, 2014, St. Claire received a cervical nerve root injection on the left at C4 and C5.  Tr. 532.

On December 3, 2014, St. Claire returned to pain management.  Tr. 731-733.  She reported that her lower back symptoms had gotten worse since October 2014 and her cervical spine symptoms had improved since her injection the month before, for which she continued to experience 50% relief.  Upon exam, she was able to transition from sitting to standing without

difficulty and walked with a non-antalgic gait.  She had positive facet loading maneuvers bilaterally and hyperalgesia to her L4-S1 distribution bilaterally.  A lumbar steroid injection was recommended.

On December 16, 2014, St. Claire returned to Dr. Hafeez for severe and intractable migraine headache and chronic neck pain.  Tr. 666-667.  Dr. Hafeez administered greater/lesser occipital nerve blocks, supraorbital nerve blocks, auriculo-temporal nerve blocks, and bilateral paracervical/trapezius paraspinal trigger point injections.  He continued her preventative medications (Clonazepam, Neurontin, Cymbalta, Zanaflex, Ambien, Abilify, Bupropion, Topamax) and added additional medications (Imitrex and Zomig).

On November 24, 2014, St. Claire saw rheumatologist Dr. Gideon, M.D., complaining of fibromyalgia tenderness all over, insomnia, and low back and neck pain.  Tr. 539-540.  Upon exam, she had 18/18 tender points, particularly in her low back, hips, and iliotibial bands.  Dr. Gideon assessed fibromyalgia and gave her Depo-Medrol injections in her hips, thighs, and SI joints.

On December 8, 2014, St. Claire returned to Dr. Gideon for a follow up, reporting that the previous injections didn't work "because she has spine pain."  Tr. 537-38.  She stated that she may need back surgery.  Upon exam, she was tender at most of the fibromyalgia tender points and over her spine.  Dr. Gideon agreed that she should have a surgical consultation and to defer her spine pain treatment to pain management.

In January 2015, St. Claire saw Dr. Gladden for a follow-up of her knee surgery performed in February 2014.  Tr. 678.  She complained of moderate pain and stated that she had returned to work a week earlier but was "currently off work because of developing the shingles."  Upon exam, she had mild patellofemoral and medial compartment findings.  Dr. Gladden

assessed early degenerative joint disease, currently stable.

On March 9, 2015, St. Claire had a surgical decompression and fusion surgery at L4, L5, and S1, performed by Dr. Logan, M.D.  Tr. 809.  Thereafter, she was admitted to a rehab facility to prepare for home.  Tr. 633.  She met her goals and was discharged after 10 days when she was able to perform her activities of daily living.  Tr. 633.  She was instructed not to lift more than 5 pounds.

On April 28, 2015, St. Claire returned to Dr. Hafeez for a follow up.  Tr. 664.  She reported that the nerve blocks did not help much.  The frequency of her headaches had decreased from 5 days a week to 3.  She reported a severe headache at the time of her visit.  Her medications were adjusted and Dr. Hafeez scheduled her for Botox injections, which he administered on May 29.  Tr. 662-663.

On June 1, 2015, St. Claire saw Dr. Gladden and reported that her knee "seemed to catch or give way on her" the month before, causing her to fall on both of her knees.  Tr. 676-677.  Her pain was 9/10 but had been improving.  Upon exam, her knee showed minimal effusion, she had some tenderness around the patellofemoral joint, and her knee was ligamentously stable.  An x-ray did not show fracture, dislocation, or loose intra-articular bodies.  Dr. Gladden recommended she continue her medications and, if her symptoms persisted, try a Depo-Medrol injection.

On June 10, 2015, St. Claire had a follow up with Dr. Logan for her lumbar surgery, wherein it was reported that she was making a reasonable, although slow, recovery from surgery. Tr. 734.  Upon exam, she had 5/5 strength in the right lower extremity and 3/5 to 4/5 strength in the left lower extremity.  She had a normal gait and moved comfortably around the exam office. She reported that she was presently on short-term disability with her employer and was applying for long term disability; her doctor agreed that she was temporarily disabled but commented that

it was too soon to say whether long-term disability was warranted.

On July 10, 2015, St. Claire saw Dr. Logan, who, in turn, wrote a letter to St. Claire's primary care doctor.  In his letter, Dr. Logan stated that St. Claire had been going to physical therapy and a TENS unit had been helpful for her pain syndrome.  She continued to have debilitating lumbar back pain.  Dr. Logan stated, "She tells me, over the past three weeks, she has noted a recurrence of her radicular left leg pain.  She also states, 'I am unbalanced.'"  Dr. Logan remarked that, upon exam, her wound had healed; she wore a lumbar brace; and she had 5/5 muscle strength in her iliopsoas, quadriceps, hamstrings, and tibialis anticus.  She had 3-4/5 strength in her left extensor hallucis longus; giveaway weakness, 4+/5 in her left gastroc soleus muscle and 5/5 strength in her right; a normal gait, including a tandem gait test; and diminished light touch sensation in a left L4-5 distribution.  Dr. Logan wrote that she was making a very slow recovery from her surgery in March and seemed "to be going somewhat backwards as far as her pain complaints."  She would continue working with physical therapy and was to have a follow up visit in six months.  He suggested that she talk to her employer about her short- and long-term disability status.

At a physical therapy appointment on July 15, 2015, St. Claire rated her pain 6/10 and reported that she had walked half a mile at the fairgrounds with her granddaughter the day before.  Tr. 761.  On July 28, she stated that taking care of her grandson was hard on her back.  Tr. 759.  On August 21, she stated that she would lift her granddaughter, who weighed more than her 15-pound weight restriction.  Tr. 757.

At an October 6, 2015, counseling visit with her therapist, St. Claire advised that she was "going back to work on Monday at Kroger."  Tr. 887-888.  She planned to work for 2 weeks then to fall into a pothole by the pharmacy "accidentally" to "prove to SSA that she cannot work due

to health problems."

On December 8, 2015, St. Claire saw Dr. Hollis, M.D., for back pain; an EMG showed no instability.  Tr. 1493.

On December 10, 2015, St. Claire saw Dr. Hafeez for Botox injections after experiencing recurrent headaches the past 2 weeks.  Tr. 1397-1398.  Her headaches included nausea, photophobia, and phonophobia, and worsened with stress, pain, activities of daily living, and weather changes.  Dr. Hafeez noted that her last Botox injections were in August 2015 and that they helped decrease the frequency of her headaches (4-5 a month, down from 15-18), and significantly decreased the intensity of the headaches (5-6/10, down from 5-8/10) and the duration (less than 4 hours, down from 6-8) for up to 3 months.  Dr. Hafeez adjusted her medications and scheduled another set of Botox injections in 90 days.

On February 15, 2016, St. Claire returned to Dr. Hafeez for an urgent visit due to recurring headaches and neck pain and stiffness.  Tr. 1399-1400.  She reported being under a lot of stress the last 2 weeks and that, otherwise, her prior Botox injections had been helping "really well."  Dr. Hafeez gave her a set of nerve block injections.

On March 9, 2016, Dr. Hollis performed lumbar surgery to remove the hardware that had been placed at L3 through S1 the year before and to perform a new lumbar fusion and fixation at the same levels.  Tr. 832-835.

On April 16, 2016, St. Claire saw Dr. Hafeez for an urgent visit due to recurring headaches and neck pain and stiffness.  Tr. 1401-1402.  Her nerve block injections in February helped significantly but were now wearing off.  She reported increased stress over the last 2 weeks.  Dr. Hafeez gave her another set of nerve block injections.

At a follow up visit with Dr. Hollis' office on April 21, 2016, St. Claire reported that,

after her recent lumbar surgery, she had significant improvements in her pain syndrome and resolution of her radicular symptoms.  Tr. 958.  However, 2 weeks prior, she fell in a pothole while walking and experienced increased symptoms.  X-rays showed good surgical hardware placement and no evidence of fractures or instability.  Upon exam, she had full bilateral muscle strength in her lower extremities, normal reflexes, negative straight leg raise testing, a normal gait with full ability to heel and toe walk, and diffuse spasm throughout her lumbar spine and gluteal areas.

On May 27, 2016, a CT scan of St. Claire's lumbar spine showed postoperative scarring at multiple levels, and mild to moderate central canal stenosis and bilateral neuroforaminal stenosis at L5-S1.  Tr. 1421-22.

On June 7, 2016, St. Claire returned to Dr. Hafeez for her Botox injections.  Tr. 1403-1404.  She returned on June 24 for an urgent visit due to recurring headaches and neck pain and stiffness.  Tr. 1405-1406.  Her recent Botox injections helped significantly, but her physical therapy exacerbated her severe neck and shoulder pain, triggering her migraines.  Dr. Hafeez gave her nerve block injections.

On July 20, 2016, St. Claire had a follow up visit at Dr. Hollis' office.  Tr. 1521-1524.  She reported a fall one week prior when her ankle gave out on her and she fell forward, further aggravating her pain syndrome.  She reported lumbosacral pain radiating to both legs, left worse than right and aggravated by "everything," and numbness in her left leg.  She had completed physical therapy but it had not improved her pain.  Upon exam, her lumbar spine had mild diffuse spasm, diffuse tenderness at trigger points, and good range of motion with increased pain with flexion and extension.  She had negative straight leg raise testing, bilateral 5/5 strength in her lower extremities, intact reflexes, and a normal gait, including the ability to heel and toe

walk.  Due to her reports of pain, updating imaging was ordered.

On July 25, 2016, St. Claire had a psychiatric appointment and reported problems with falls and paresthesia in her legs.  Tr. 953.  She stated that she needs disability and told the doctor that he did not understand her need for disability.  The doctor observed that he had previously suggested that St. Claire seek a second opinion from another provider but she did not do so.  She reported feeling confused but retracted her statement after her doctor remarked that she should not be on opiate-based medications.

On September 12, 2016, St. Claire saw Dr. Hafeez; she was due to have Botox injections but her insurance hadn't approved them yet.  Therefore, Dr. Hafeez gave her nerve block injections.  Tr. 1407-1408.

A CT scan of St. Claire's lumbar spine taken on September 23, 2016, showed marked scarring and granulated tissue in the lower lumbar levels with neural foraminal narrowing on the right at L5-S1.  Tr. 1429-30.  An MRI taken October 27, 2016, showed scarring abutting or encasing exiting nerve roots at L4-L5 and L5-S1.  Tr. 1426-1427.

### C. Opinion Evidence

### 1. Treating Source

On May 29, 2015, Dr. Hafeez completed a questionnaire on St. Claire's behalf.  Tr. 660, 670.  He listed her diagnoses: chronic migraine headaches, cervicalgia/degenerative spine, chronic low back pain, and anxiety and depression.  He described her symptoms: moderate to severe pain in her low back and neck and severe headaches at least 15 days per month.  Physical findings included tenderness in the occipital, paracervical, paratrapezius/lumbar areas and decreased range of motion in her neck and lower back.  He described her response to treatment as "doing relatively better.  But low back pain persists."  He stated that she was "unable to

perform duties/work" and has difficulty doing her housework.

On July 9, 2015, Dr. Gladden completed a questionnaire on St. Claire's behalf.  Tr. 672-674.  He listed her diagnosis: osteoarthritis and chondromalacia in her left knee.  The nature and symptoms of her condition were "degenerative processes to joint surfaces."  Exam findings included limited range of motion, swelling, and crepitus.  He assessed her limitations: "no prolonged stand-walk-push-pull-carry-climb."

### 2. Consultative Examiner

 On February 24, 2015, St. Claire saw Dr. Weaver, M.D., for a consultative examination.  Tr. 542-550.  She reported that, due to her problems in her low back, neck, left knee, hands, and fibromyalgia, she could sit, stand and walk only about 5 minutes at a time and she could lift and carry no more than 5 pounds.  Upon exam, she walked with a stiff, guarded gait.  She had multiple tender trigger points (more than 11/18) in all major muscle groups of both upper and lower extremities.  She had positive Tinel and Phalen's tests in both hands and diffuse paresthesia in both hands and feet.  Straight leg raise was positive bilaterally.  She performed only 20% of a normal squat and needed assistance to get up from the exam table, complaining of left knee and bilateral leg pain.  She showed some decreased strength on manual muscle testing due to pain inhibition.  Muscle spasm was present upon exam and range of motion of her cervical and lumbar spine was decreased.  Dr. Weaver diagnosed probable fibromyalgia syndrome; probable chronic neck, lower back, and radicular lower extremity pain with degenerative disease status post two-level cervical fusion with two-level lumbar fusion pending; probable chronic left knee pain with possible degenerative disease; and possible recurrent bilateral carpal tunnel syndrome.  He opined that St. Claire would "probably" be limited in multiple activities including sustained sitting, standing, walking, reaching, lifting, carrying, handling objects, and driving, and

that she would "probably" be able to perform physical activities involving speaking, hearing, following directions, and travel not involving driving.

### 3. State Agency Reviewing Physicians

On March 17, 2015, state agency reviewing physician Dr. Klyop, M.D., opined that St. Claire could perform light work with additional postural limitations and could frequently handle and finger with both hands.  Tr. 109-110.  On September 24, 2015, state agency reviewing physician Dr. Das, M.D., adopted Dr. Klyop's opinion and added more restrictive postural limitations and a limitation to avoid all exposure to hazards.  Tr. 128-29.

### D.  Testimonial Evidence

### 1. St. Claire's Testimony

St. Claire was represented by counsel and testified at both administrative hearings.

March 8, 2017: At the first hearing, St. Claire testified that she lives in a large house with a roommate.  Tr. 51-52.  Her sister picks her up every morning and takes her to her place, where St. Claire spends the day, because her sister lives in an apartment geared towards senior living and it's easier to get around there.  Tr. 51-52, 83.  There are railings in the bathrooms.  Tr. 83. At St. Claire's house, she sleeps upstairs and, therefore, has to walk upstairs every night to go to bed.  Tr. 68.  She does little chores at her house; she will load and unload the dishwasher.  Tr. 68. She and her sister prepare meals at her sister's place.  Tr. 75.  Most of her clothes are there, too, and her sister does the laundry.  Tr. 68.  St. Claire has a driver's license and drives when her sister doesn't feel well.  Tr. 69-70.  She cannot go on long trips, i.e., more than two hours.  Tr. 69-70.  She has two daughters, one local and one two hours away, and five grandchildren.  Tr. 77.  She does not see her grandchildren very often due to a falling out with her daughters.  Tr. 79.

When asked whether she could perform her past work at Kroger as a check-out scanner,

St. Claire stated that she could not due to what "my limitations are, what they told me."  Tr. 65.
She needs to sit down at least three hours throughout the day.  Tr. 65.  Standing on the hard floor
for hours was hard on her knees and back.  Tr. 85.  She has numbness from her knee down and
had fallen at work.  Tr. 65.  After her knee surgery the problem got better; she fell once a week
instead of every day.  Tr. 87.  She also has sharp pain that makes her scream.  Tr. 66.  She has
pain in her low back and in her foot.  Tr. 66.  Her left leg is numb.  Tr. 66.  She has never used a
cane; they never suggested it at therapy.  Tr. 67.  She has "foot drop," which is why she doesn't
like walking up and down stairs.  Tr. 67-68.  She is able to sit in a regular chair for, at most, 20
minutes.  Tr. 71.  She will fall asleep in her sister's "reclining couch" for 1 to 1.5 hours.  Tr. 71.
She estimated that she can walk 10 city blocks.  Tr. 71.  Later, St. Claire explained that she could
walk 10 small blocks, like in her neighborhood, but could only walk 1 to 1.5 city blocks.  Tr. 88.
When she walks, she gets tired and her back, leg and foot hurt.  Tr. 88.

  The ALJ listed St. Claire's medications and she confirmed that she takes those
medications.  Tr. 72.  When asked about side effects, St. Claire answered that the high dose of
gabapentin makes her mouth very dry.  Tr. 73.  She sleeps for 4-5 hours at a time, and, on a good
night, sleeps for 7 hours total.  Tr. 73.  When asked if she naps during the day, St. Claire
answered that she rarely can nap "because we're running too much."  Tr. 73.  She explained that
she and her sister run errands and St. Claire accompanies her sister to her physical therapy
appointments, which she has 2-3 times a week.  Tr. 73-74.  They go to the grocery store once a
week and St. Claire shops using a regular shopping cart.  Tr. 76.  Her sister carries the groceries
from the car to the house in her motorized cart.  Tr. 89.  They visit her sister's friends.  Tr. 83.
She goes to counseling once a week unless she has transportation problems.  Tr. 78-79.

  Sometimes, St. Claire's sister does not pick her up from her house, and St. Claire will just

stay in her house all day.  Tr. 91.  She gets migraines; she woke up with one the morning of the hearing.  Tr. 91.  She sees Dr. Hafeez for her migraines and he gives her Botox shots every 3 months, depending on her insurance.  Tr. 91.

May 5, 2019: At the second hearing, St. Claire was asked if her conditions had improved or worsened since the first hearing and she stated that they were about the same.  Tr. 1097.  The ALJ asked her what fibromyalgia symptoms she experienced in February 2014, her alleged onset date, when she had been working at Kroger.  Tr. 1097.  St. Claire explained that she would feel pain in her back, knees, through her body, and that she was sore all the time.  Tr. 1097-1098.  She would be tired when she would get home.  Tr. 1098.  She saw Dr. Hafeez for her fibromyalgia and he had prescribed Cymbalta.  Tr. 1099.  It did not help with her symptoms.  Tr. 1099.  Her other symptoms include feeling foggy and wanting to sleep; she had been in bed the last three days because she was so tired and she hurt so bad.  Tr. 1099.  The fog makes her not really know what she's doing; "you feel like you're in this bubble."  Tr. 1106.  When asked if she felt that way prior to 2016, St. Claire stated that she did feel that way, daily.  Tr. 1107.  It tended to be worse at the end of the day.  Tr. 1107.

St. Claire testified that she may have another surgery on her left knee and that her right knee is bothering her now because she overuses it to compensate for her left knee problems.  Tr. 1100.  She does not use an assistive device for walking.  Tr. 1100.  Her left knee is numb and she loses her balance every once in a while.  Tr. 1100.  St. Claire had had weight loss surgery and lost a significant amount of weight.  Tr. 1101.  Her pain has not improved despite her weight loss.  Tr. 1101.

She also stated that she still gets migraines.  Tr. 1100-1101.  During the time period prior to 2016, she was having headaches at least 3 to 4 times a week.  Tr. 1103.  She had about 3

different medications, so when she would get a headache she would try taking one medication; if that didn't work, she would take the second medication, etc.  Tr. 1103.  If none of her medications worked, she would call Dr. Hafeez' office and they would get her an appointment and she would get nerve block injections.  Tr. 1103.  If her headache was addressed by the second medication she took, it would last approximately 5 or 6 hours.  Tr. 1103.  During that time, she would cover her head and lie in darkness.  Tr. 1103.  Botox injections helped the frequency and intensity of her headaches, and she would get them every three months or so.  Tr. 1104.  The relief lasted six weeks, and then she would go in for nerve block injections, which helped her through the remaining six weeks.  Tr. 1105.  The final two weeks she would have 3 or 4 headaches again.  Tr. 1105.  At best, those headaches lasted a couple of hours and she would have to lie back and have total quiet.  Tr 1105.

### 3.  Vocational Expert's Testimony

A Vocational Expert ("VE") testified at the both hearings, and the relevant testimony at the second hearing is as follows:  The ALJ discussed with the VE St. Claire's past work.  Tr. 1108-1109.  The ALJ asked the VE to determine whether a hypothetical individual of St. Claire's age, education, and vocational background could perform her past work or any other work if that person had the limitations subsequently assessed in the ALJ's RFC determination, described below.  Tr. 1110.  The VE answered that such an individual could not perform St. Claire's past work but could perform the following jobs that exist in significant numbers in the national economy: mail clerk, routing clerk, and garment sorter.  Tr. 1111.

### III. Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial

gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1. If claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[1] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

---

[1] The DIB and SSI regulations cited herein are generally identical. Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the vocational factors to perform work available in the national economy.  *Id.*

### IV. The ALJ's Decision

In her July 10, 2019, decision, the ALJ made the following findings:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2021.  Tr. 1061.

2. The claimant has not engaged in substantial gainful activity since February 25, 2014, the alleged onset date.  Tr. 1061.

3. The claimant has the following severe impairments: fibromyalgia, degenerative disc disease of the cervical and lumbar spine; post laminectomy syndrome; bilateral carpal tunnel syndrome; posttraumatic arthritis of the left knee; obesity; depression; anxiety; and post-traumatic stress disorder (PTSD).  Tr. 1062.

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.  Tr. 1062.

5. The claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except: occasional climbing of ramps and stairs; no climbing ladders, ropes, or scaffolds; occasional balancing, stooping, kneeling, crouching, and crawling; frequent handling and fingering with the bilateral upper extremities; no exposure to workplace hazards such as unprotected heights and dangerous moving machinery; no commercial driving; further limited to simple, routine tasks that are not fast pace meaning the pace of productivity is not dictated by an external source over which she has no control; only occasional interaction with coworkers, supervisors, and the public; no responsibility for conflict resolution; and the work routine should be repetitive from day to day with few and expected changes.  Tr. 1064.

6. The claimant is unable to perform any past relevant work.  Tr. 1077.

---

C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

7.      The claimant was born in 1961 and was 52 years old, which is defined as an individual closely approaching advanced age, on the alleged disability onset date.  Tr. 1077.

8.      The claimant has at least a high school education and is able to communicate in English.  Tr. 1077.

9.      Prior to December 14, 2016, transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills.  Tr. 1077.

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.  Tr. 1077.

11.     The claimant was not disabled prior to December 14, 2016, but became disabled on that date and has continued to be disabled through the date of this decision.  Tr. 1078.

### V. Plaintiff's Arguments

St. Claire argues that the ALJ erred when evaluating her statements regarding her symptoms and when she failed to address whether her headaches were a severe impairment. Doc. 14.

### VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.,* 889 F.2d 679, 681 (6th Cir. 1989) (per curiam) (citations omitted)).  A court "may not try the case *de novo*, nor

resolve conflicts in evidence, nor decide questions of credibility."  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

### A. The ALJ did not err when evaluating St. Claire's pain

St. Claire argues that the ALJ's RFC finding is faulty because the ALJ erred when she evaluated St. Claire's pain.  Doc. 14, p. 16.  A claimant's statements of pain or other symptoms alone are not sufficient to establish the existence of a physical or mental impairment or disability. 20 C.F.R. § 404.1529(a); SSR 16-3p, 2017 WL 5180304.  When a claimant alleges impairment-related symptoms, a two-step process is used to evaluate those symptoms.  20 C.F.R. § 404.1529(c); 2017 WL 5180304, *2-8.  First, a determination is made as to whether there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce the claimant's symptoms, e.g., pain.  *Id.*, *3-4.  Second, once the foregoing is demonstrated, an evaluation of the intensity and persistence of the claimant's symptoms is necessary to determine the extent to which the symptoms limit the claimant's ability to perform work-related activities.  *Id.* at *3, 5-8.  To evaluate a claimant's subjective symptoms, an ALJ considers the claimant's complaints along with the objective medical evidence, information from medical and non-medical sources, treatment received, and other evidence.  *Id.*  In addition to this evidence, the factors set forth in 20 C.F.R. 404.1529(c)(3) are considered: daily activities; location, duration, frequency, and intensity of pain or other symptoms; factors that precipitate and aggravate the symptoms; type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms; treatment, other than medication for relief of pain or other symptoms; measures other than treatment a claimant uses to relieve pain or other symptoms, e.g., lying flat on one's back; and any other factors pertaining to a claimant's functional limitations and restrictions due to pain or other symptoms.  *Id.* at *7-8.  The ALJ's

decision "must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." *Id*. at *10.

"An ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility.  Nevertheless, an ALJ's assessment of a claimant's credibility must be supported by substantial evidence."  *Calvin v. Comm'r of Soc. Sec*., 437 Fed. App'x 370, 371 (6th Cir. 2011) (citing *Walters*, 127 F.3d at 531).

St. Claire complains, "The ALJ takes comments out of context and overstates Ms. St. Claire's daily activities to find her more functional than her impairments allow on a sustained basis."  Doc. 14, p. 18.  For example, St. Claire states, the ALJ cited a September 2014 note from her psychiatrist indicating that she was still traveling and spending time with her daughter and grandchildren on a regular basis.  Doc. 14, p. 18.  She submits that the note cited by the ALJ was a psychiatric visit, rather than a physical-related provider visit, and, second, this reference to traveling was an isolated incident insufficient to undermine her experiences of pain.  Doc. 14, p. 18.

St. Claire's argument is not well taken.  The ALJ's citation of this note, in full context, is as follows:

> The undersigned notes that records from September are somewhat contradictory (3F:12). At the outset, the claimant reported significant anxiety, panic, and PTSD symptoms and that she had a hard time getting out and is "unable to return to work" (Id.). However, office notes from that same visit indicate the claimant is "still traveling" and spends "time with her daughter and her kids on a regular basis" (3F:12). The undersigned also notes that the records from Dr. Bundy contain only one reference to chronic pain, and make no mention of the claimant appearing to be in discomfort during her visits (3F). Additionally, office notes from September indicate that the claimant reportedly had not

returned to work due to "ongoing psychological issues" as opposed to physical complaints (1F:6). Exam notes from September note the claimant to have a weak hand grasp bilaterally, "with no other musculoskeletal, neurological or sensory deficits appreciated" (4F:16). The undersigned notes that October exam notes from Findlay Family Practice are unremarkable and make no mention of chronic pain (4F:3).

Tr. 1067.  The ALJ's citation to this record (3F:12, Tr. 431) is accurate and the records are notable for their inconsistency, as the ALJ observed.  And St. Claire cites no legal authority preventing an ALJ from citing a psychological treatment note when discussing a claimant's statements regarding her symptoms, be they mental or physical.[2]  It is relevant that, when seeing her psychologist, St. Claire only mentioned chronic pain once and that her doctor did not find her to be in discomfort, especially given St. Claire's allegations of severe chronic pain.

Next, St. Claire argues that the ALJ "cites briefly to a family care note around the same time as Dr. Bundy's note to also show no pain complaints."  Doc. 14, p. 19 (citing Tr. 436).  She asserts that that treatment note indicates that St. Claire was to see a specialist concerning her fibromyalgia and the primary purpose of the appointment was to follow up on depression.  That record, Tr. 436, was a visit with St. Claire's primary care physician.  The fact that she had no pain complaints during that visit is accurate.  Given the ALJ's thoroughly detailed discussion in the balance of her decision, including numerous references to pain complaints, the fact that the ALJ cited this treatment note from St. Claire's visit to her primary care physician when the ALJ discussed medical visits St. Claire had in September and October 2014 is not error.

St. Claire asserts that the ALJ's comment about the record regarding her weak hand grasp with no other significant findings noted was "woefully incomplete."  Doc. 14, p. 19 (citing Tr. 449); Doc. 17, p. 3.  She submits that the record cited by the ALJ also showed the following cervical spine findings: positive facet loading maneuvers bilaterally, 4/5 shoulder abduction to her left upper extremity, and a positive Hoffman's reflex.  It is true that the exam findings

---

[2] St. Claire also alleged that she was disabled due to mental impairments.

included those aforementioned cervical spine findings, as well as weak hand grasp and "no

musculoskeletal, neurologic or sensory deficits appreciated today."  Tr. 449.  However, the

ALJ's failure to note those cervical spine findings is not error where, as here, the ALJ

exhaustively detailed St. Claire's cervical spine impairment, including in the paragraph

immediately following the paragraph quoted above.  See Tr. 1066 (The ALJ remarking that St.

Claire saw her primary care physician in February 2014 for management of her fibromyalgia,

cervicalgia, and low back pain); Tr. 1067 (The ALJ stating, "An MRI completed in October

[2014], noted a slight progression of mild disc spur complex at C4-5, causing a mild indentation

of the anterior CSF space and minimal flattening of the anterior spinal cord; however, no

significant cord edema was noted (4F:18)"; referencing an October 2014 visit in which St. Claire

had positive cervical and lumbar facet loading maneuvers bilaterally and Hoffman's reflex on the

left upper extremity; she received a left C4 and C5 nerve root injection and reported 50% relief

as a result; in November 2014 she had paracervical tenderness as well as a decreased range of

motion of her cervical spine with lateral rotation, extension and flexion); Tr. 1068 (ALJ noting

that St. Claire received bilateral para-cervical/trapezius para spinal trigger point injections in

December 2014; at a consultative examination in February 2015, she was found to have a

decreased range of motion in her cervical and lumbar spine with constant, involuntary spasms of

the lower cervical, trapezius and lumbar musculature with multiple tender trigger points; in

March 2015 she had normal range of motion in her shoulders, arms, and hands); Tr. 1069 (the

ALJ commenting that, in May 2015, St. Claire had trigger point injections after being diagnosed

with chronic migraines and cervicalgia /cervicogenic headaches; imaging in September 2015 of

her cervical spine showed overall stable postoperative changes at C5-6 and C6-7 and exam

findings showed full range of motion and strength in her upper extremities); Tr. 1070 (the ALJ

remarking that, in September 2015, St. Claire received another round of trigger point injections; she was informed that her cervical spine did not require surgery; in April and June 2016 she received injections for her headaches and neck pain; and in August 2016 she had intact range of motion in all extremities).  The ALJ's description of St. Claire's lumbar spine impairment is equally exhaustive.  Tr. 1066-1071.  Thus, St. Claire's assertion that "the ALJ relied on isolated notes rather than underlying objective evidence to reach her conclusions about Ms. St. Claire's experience of pain and other symptoms" is not persuasive.

**B. The ALJ did not err when evaluating St. Claire's fibromyalgia**

St. Claire argues that, at times, the ALJ claimed that there were no objective clinical findings to support her experience of pain.  Doc. 14, p. 21 (citing Tr. 1076, wherein the ALJ noted that she retained normal strength and gait).  She asserts that individuals suffering from fibromyalgia often "manifest normal muscle strength and neurological reactions and have a full range of motion."  Doc. 14, p. 21 (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 243-44 (6th Cir. 2007).

St. Claire's argument fails.  First, St. Claire alleged symptoms also stem from other impairments, including lumbar spine issues and knee pain, in which objective clinical findings such as strength and gait are relevant.  Second, the ALJ discussed findings other than gait and strength that are relevant to her fibromyalgia symptoms.  The ALJ explained, in full:

> The undersigned has carefully considered the claimant's statements concerning her impairments and their impact on the ability to perform work activity and finds the allegations are somewhat inconsistent with the other medical evidence of record. This is not to say that the claimant was symptom free, or did not experience difficulty performing some tasks. However, the record as a whole does not demonstrate the existence of limitations of such severity as to have precluded onset date of disability. While imaging studies showed some positive findings, the claimant retains normal strength and gait. The record indicates that she was lifting greater than fifteen pounds, traveling, working on and off, and physically able to date. The undersigned notes that while numerous tender points were noted and the claimant complained of chronic pain,

the record indicates that the claimant was consistently looking to return to work at Kroger and was able to engage caring for her grandchildren. Additionally, the claimant was rarely noted to be in discomfort related to a chronic pain. Furthermore, as mentioned above, the claimant reported improvement in her fibromyalgia symptoms with the use of Cymbalta. Finally, although the claimant received a series of trigger point injections from Dr. Hafeez, beyond the initial evaluation, minimal objective findings were noted to support the need for such injections. Mental health records generally show good response to treatment and medications, and the claimant is able to engage in a variety of activities, such as personal care, and chores. While the record indicates that the claimant had "plan" to fall into a pothole and injure herself, and in fact did do so a few months later, the undersigned has based this decision solely on the medical evidence contained in the evidence and nothing more. The onset, nature, intensity, and duration of symptoms, as well as precipitating and aggravating factors, have all been factored into the residual functional capacity assessment set forth herein for this claimant (SSR 16- 3p). Consequently, the specified residual functional capacity is consistent with the functional limitations that can be expected from the nature and extent of the claimant's medically determinable impairments, based upon the totality of the evidence of record. The undersigned notes that the above residual functional capacity incorporated those limitations caused by all of the claimant's severe impairments, including fibromyalgia.

Tr. 1076-1077.

The ALJ did not err when evaluating St. Claire's fibromyalgia.

**C. The ALJ did not err when evaluating St. Claire's headaches**

St. Claire argues that the ALJ erred because she did not consider whether her headaches were a medically determinable impairment at step two.  Doc. 14, pp. 21-22.  However, the ALJ did not err in this respect because she found other impairments severe at step two and considered St. Claire's headaches when assessing her RFC finding.  *See Pompa v. Comm'r of Soc. Sec.*, 73 F. App'x 801, 803 (6th Cir. 2003) (no error when the ALJ failed to find a number of the claimant's impairments severe at step two but went on to consider all the claimant's impairments in her residual functional capacity assessment finding).

St. Claire concedes that the ALJ mentioned her headaches in her decision.  But she submits that the ALJ's mere recognition of appointments to treat her headaches "does nothing to address the issue of medically determinable impairment."  Doc. 14, p. 22.  However, the ALJ did

not just mention her appointments to treat her headaches; she observed that her treatments improved her headaches.  Tr. 1068.  The ALJ also commented that St. Claire had stopped working because she developed shingles, not because of her headaches or other impairments. Finally, the ALJ remarked that St. Claire received treatment for her headaches at the Neurology Headache and Fibromyalgia Clinic; as headaches are a symptom of fibromyalgia,[3] the ALJ's discussion of St. Claire's fibromyalgia included consideration of her complaints of headaches.

St. Claire asserts that she was treated with Botox injections, but that the ALJ did not mention the word "Botox" in her decision.  Doc. 14, p. 23.  The ALJ's failure to mention the word "Botox" when describing St. Claire's numerous injections for her headaches is not error. St. Claire complains that the ALJ stated, "the office notes from Dr. Hafeez are heavily based upon the claimant's subjective complaints and lack objective findings."  Doc. 14, p. 24.  She states, "It is unclear what objective findings the ALJ was looking for to document headaches given Ms. St. Claire's longstanding headaches[.]"  Doc. 14, pp. 24-25.  But it is not uncommon for providers to note when their patients are exhibiting signs of distress upon exam.  Such notations are absent from Dr. Hafeez's treatment notes.  It was reasonable for the ALJ to make that observation, especially given St. Claire's statements regarding the severely disabling nature of her headaches.  See Tr. 1103, 1005 (St. Claire explaining that when she had a headache she had to lie down in total darkness and quiet).  As the ALJ accurately observed, "[St. Claire] was rarely noted to be in discomfort related to a chronic pain."  Tr. 1076.

Finally, St. Claire objects to the ALJ's following statement: "[A]lthough the claimant received a series of trigger point injections from Dr. Hafeez, beyond the initial evaluation, minimal objective findings were noted to support the need for such injections."  Doc. 14, p. 24

---

[3] *See, e.g.*, https://www.mayoclinic.org/diseases-conditions/fibromyalgia/symptoms-causes/syc-20354780 (last visited 4/2/2021).

(citing Tr. 1076).  She argues that, by making that statement, the ALJ "impermissibly stepped into the role of doctor, actually questioning a specialist's treatment decisions."  Doc. 14, p. 24. The Court disagrees.  The ALJ was not questioning Dr. Hafeez's treatment decisions; rather, she accurately observed that minimal objective findings were noted during St. Claire's visits with Dr. Hafeez after her initial evaluation.

St. Claire has not identified an error made by the ALJ.  Therefore, the decision of the Commissioner is affirmed.  *See Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745–746 (6th Cir. 2007) (The Commissioner's decision is upheld if it is supported by substantial evidence and the correct legal criteria was applied).

## VII. Conclusion

For the reasons set forth herein, the Commissioner's decision is **AFFIRMED**.


IT IS SO ORDERED.



Dated: April 2, 2021

*/s/Kathleen B. Burke*
Kathleen B. Burke
United States Magistrate Judge